STEAMSHIP TRADE ASSOCIATION OF BALTIMORE, INC., PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6051–81.    Filed September 13, 1983.

*Neil S. Kurlander* and *A. Adgate Duer*, for the petitioner.
*Howard Philip Newman*, for the respondent.

STERRETT, *Judge*: By notice of deficiency dated February 11, 1981, respondent determined deficiencies in petitioner's Federal income taxes in the amounts of $149,318, $126,927, and $94,779 for the years 1975, 1976, and 1977, respectively. The sole issue for decision is whether petitioner's administration and management of the vacation benefit fund and the guaranteed annual income fund constitute the conduct of an unrelated trade or business, thereby subjecting petitioner to the unrelated business income tax imposed by section 511, I.R.C. 1954.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Steamship Trade Association of Baltimore, Inc., is a not-for-profit membership corporation incorporated under the laws of the State of Maryland. Its main office was located in Baltimore, Md., at the time of filing the petition herein. Petitioner filed a Return of Organization Exempt from Income Tax, Form 990, for each of the taxable years 1975, 1976, and

1977 with the Internal Revenue Service Center at Philadelphia, Pa.

During the years at issue, petitioner was exempt from income tax as an organization qualified under section 501(c)(6). The members of petitioner are 49 employer-companies engaged in the business of maritime shipping and related services. Each of petitioner's members pays an equal amount of dues, $350 per year, to petitioner.

The purpose of petitioner, as stated in article 1, section 2, of its bylaws is:

to promote the interests of the Port of Baltimore and vicinity, to further the common interests of those business establishments which are directly engaged in or render services to the maritime trade in the Port of Baltimore, to render assistance to the membership in the solution of their maritime problems, to maintain harmony between management and labor, to foster just and equitable principles and practices among those engaged in the maritime trade, to cooperate with public officers, other organizations and associations who, through the exercise of their authority or the conduct of their activities, govern, regulate or promote any of the affairs of the Port for the betterment, expansion, development and prosperity of the Port.

Part III(2) of the Certificate of Incorporation of petitioner states that it was formed: "(2) To promote just and friendly relations between members of the corporation and their employees and associations of employees." In this respect, petitioner has for many years negotiated and administered collective bargaining agreements for its members with the International Longshoremen's Association (hereinafter referred to as ILA) for the Port of Baltimore.[1]

The collective bargaining agreement negotiated by petitioner for its members with the ILA for the Port of Baltimore covering the period October 1, 1974, through September 30, 1977, has been stipulated into evidence. It provides for a guaranteed annual income account to insure that all eligible employees covered by the agreement, who are properly registered, shall receive an annual income of at least 1,900 hours times a specified hourly rate of pay per contract year. It also sets forth a number of circumstances under which hours will

---

[1]To facilitate these negotiations, petitioner has formed a trade practice committee, which represents it in negotiating collective bargaining agreements.

be debited in determining the guaranteed annual income payments to be made to eligible employees.

In addition, the collective bargaining agreement provides for vacation pay to eligible employees. An employee who has received credit for not less than 675 hours and not more than 1,099 hours is entitled to 1 week's vacation pay; while an employee who has received credit for not less than 1,100 hours and not more than 1,299 hours is entitled to 2 weeks' vacation pay. The employee can receive additional weeks of vacation pay, up to a maximum of 6 weeks, if he satisfies more stringent hourly credit requirements. The collective bargaining agreement contains provisions outlining the circumstances under which employees will receive credit towards the computation of vacation pay eligibility.

The calculation of both guaranteed annual income pay and vacation pay under this collective bargaining agreement is complicated by the fact that the union employees covered by the agreement will generally work for a number of different employer-members of petitioner during any given time period. Consequently, since eligibility for both types of pay is based upon hours worked, single employer-members of petitioner are generally unable to determine their respective accrued liabilities for vacation and guaranteed annual income pay. Petitioner eradicates this problem by serving as a central repository for payroll information. Petitioner collects the payroll information, transmits this information to the Service Bureau Corp., which puts the information in a usable format, computes the assessment rate to support the accounts, administers the collection and disbursement of funds from the members, and reports to the ILA with respect to these functions.

Petitioner's members make payments to the guaranteed annual income account and vacation pay account, which payments are deposited by petitioner in a bank account under its control. For the years in question, each employer-member paid a fee to petitioner per man-hour on behalf of each worker in order to fund the vacation pay account. The fee per man-hour was $0.80 from January 1, 1975, to September 30, 1975; $1.10 from October 1, 1975, to April 30, 1976; $1.30 from May 1, 1976, to September 30, 1976; and $1.45 from October 1, 1976, through December 31, 1977. Petitioner retained $0.08 per

man-hour of these payments as its own fee for administering this account.

With respect to the guaranteed annual income account, each employer-member paid a fee to fund this account based on each member's hourly payroll at the rate of $0.15 per man-hour. Petitioner retained $0.02 per man-hour as its fee for administering this account.

The vacation pay and guaranteed annual income assessments are collected solely from members of petitioner. Petitioner has never attempted to perform administrative services for nonmembers.

Petitioner retained $606,350, $540,932, and $502,323 in 1975, 1976, and 1977, respectively, as its fees for administering the vacation pay and guaranteed annual income accounts. These retained fees represent 10.1 percent, 7 percent, and 5.6 percent of petitioner's gross receipts in 1975, 1976, and 1977, respectively.

Petitioner pays the expenses of administering the vacation pay and guaranteed annual income accounts out of its retained fees. The major portion of such expenses are payments to the Service Bureau Corp., a commercial for-profit corporation, which is not related to petitioner. The Service Bureau Corp. provides computer services whereby it coordinates the information received from petitioner and puts it into a form petitioner can use to track each longshoreman's eligibility for benefits.[2] Petitioner transfers the relevant information to the Service Bureau Corp. without performing any substantial services so that if the members chose, they could have transmitted the information directly to the Service Bureau Corp. However, the Service Bureau Corp. is not in the business of interpreting provisions of collective bargaining agreements or attempting to resolve labor-management disputes.

In return for the computer services received from the Service Bureau Corp., petitioner pays a substantial fee, approximately $300,000 per year. The amounts retained by petitioner after paying this and other administrative expenses are used for its general operational purposes and to meet any

---

[2] Petitioner retains ownership of the computer programs.

emergency that might arise, such as a prolonged strike or a shutdown as a result of an accident or natural disaster.

In his notice of deficiency, respondent determined that petitioner's administration and management of the vacation pay and guaranteed annual income accounts constituted the conduct of an unrelated trade or business and that, therefore, the income from such activities was unrelated business taxable income subject to the tax on such income.[3]

## OPINION

Section 501(c)(6) provides a tax exemption for the following organizations:

(6) Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

The above definition is amplified in section 1.501(c)(6)(1), Income Tax Regs., as follows:

A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. * * *

The parties have stipulated that petitioner qualified as an organization described in section 501(c)(6) and the regulations thereunder for the tax years in question. However, notwithstanding its qualification under these provisions, petitioner may still be liable for the tax imposed by section 511 if it has any unrelated business taxable income (hereinafter referred to as UBTI). UBTI is defined in section 512(a)(1) as the gross

---

[3]It is stipulated that if petitioner is liable for the unrelated business tax under sec. 511, the amounts of the deficiencies for 1975, 1976, and 1977 are correctly set forth by the statutory notice.

income derived by any organization from any unrelated trade or business regularly carried on by it, less allowable deductions and other adjustments provided in section 512(b). The phrase "unrelated trade or business" is defined in section 513(a) as any trade or business the conduct of which is not substantially related (aside from the need of the organization for income or funds or the use it makes of the profits derived) to the exercise or performance of the organization's exempt purpose or function. Therefore, gross income of an exempt organization is includable in the computation of UBTI if: (1) The income is derived from a trade or business; (2) the trade or business is regularly carried on by the organization; and (3) the conduct of the trade or business is not substantially related (other than through the production of funds) to the organization's performance of its exempt function. Sec. 1.513–1(a), Income Tax Regs.

In the instant case, petitioner's exempt purpose is the promotion of labor-management harmony between maritime employers and unions in the Port of Baltimore. In furtherance of this exempt purpose, petitioner performs certain services— the negotiation of collective bargaining agreements and the settling of grievances between longshoremen and employers— which respondent concedes are within the scope of section 501(c)(6) because they promote the common interests of the industry. However, in addition to petitioner's roles as a contract negotiator and an arbitrator of contractual disputes, petitioner also performs several administrative activities with respect to the vacation pay and guaranteed annual income accounts. These activities include the keeping track of how many hours each longshoreman worked for all petitioner's members, the computation of the assessment rates to support the accounts, the collection of assessments from its members, the payment of benefits to eligible employees, and the accounting to the union with respect to the accounts. For these services, petitioner charges its members a fee based on the size of each member's hourly payroll. Respondent asserts that these activities are severable from petitioner's activities as a contract negotiator and arbitrator and are not part of petitioner's exempt function. It is thus our task to determine whether the income from these activities is includable in petitioner's UBTI.

A. *Trade or business.*

The primary objective of the adoption of the unrelated business income tax was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations on the same tax basis as the taxable business enterprises with which they compete. Sec. 1.513–1(b), Income Tax Regs. Section 513(c) provides the following clarification of the trade or business requirement embodied in section 513:

SEC. 513(c). ADVERTISING, ETC., ACTIVITIES.—For purposes of this section, the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. Where an activity carried on for profit constitutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit.

Thus, under this section, any activity which is carried on for the production of income from the sale of goods or performance of services constitutes a trade or business for purposes of the tax on unrelated business income. Accordingly, respondent asserts that petitioner's administrative activities with respect to the vacation pay and guaranteed annual income accounts constituted the performance of services for the production of income and thus satisfy the trade or business requirement.

Petitioner, on the other hand, contends that its administrative activities are not conducted in a commercial manner and therefore should not be considered a trade or business. In support of this contention, petitioner argues that (1) in every major port in the United States, trade associations perform the administrative functions performed by it; (2) it would not be feasible to engage the services of a business concern to carry out the administrative activities it performs since administration of the accounts requires interpretation of complex provisions of the collective bargaining agreement; (3) it would not be feasible to permit a commercial organization to administer the accounts because of the need to preserve the confidentiality of the payroll information; (4) the only activities which

could be performed by a commercial organization in the administration of the vacation pay and guaranteed annual income accounts are performed by the Service Bureau Corp.; and (5) its administrative activities are not performed in a manner which has the characteristics of a trade or business under section 162. We will examine each of these contentions individually.

With respect to petitioner's first contention that the administrative functions performed by it are performed by trade associations in every major port in the United States, petitioner has failed to carry its burden of this assertion. The only evidence introduced on this point was the uncorroborated testimony of Mr. William J. Detweiler, the president of petitioner, who stated that he was not aware of any third-party commercial organizations that perform the administrative functions of petitioner. There are several problems with this testimony. First, while we do not doubt the honesty of Mr. Detweiler, he worked in only two ports, and petitioner has failed to establish that he had firsthand knowledge of what was done in other ports. Second, we are not sure what administrative functions Mr. Detweiler was referring to in his testimony since he did not testify specifically about those activities at issue in this case. Finally, Mr. Detweiler did not state affirmatively that no commercial organization performed the services at issue; his answer to the relevant question was far from definitive.

With respect to petitioner's second assertion that it would not be feasible to engage the services of a business concern to carry out the administrative activities it performs because such activities involve the interpretation of complex provisions of the collective bargaining agreement, petitioner misconstrues the point argued by respondent that there is a crucial distinction between petitioner's role as a labor negotiator and arbitrator and its role as a recordkeeper and collection and disbursement agent. Respondent has conceded that petitioner's activities as a labor negotiator and arbitrator are part of its exempt function and that it is only petitioner's activities as a recordkeeper and collection and disbursement agent that constitute an unrelated trade or business. We agree with respondent that these activities are severable and should be examined separately.

With respect to petitioner's third contention that it would not be feasible for a commercial organization to administer the accounts because of the need to preserve the confidentiality of the payroll information, we do not believe that petitioner has adequately established either the need for confidentiality or the fact that its administration of these activities insures such confidentiality. Petitioner has failed to present any evidence, other than Mr. Detweiler's opinion, that the disclosure of payroll information could harm one of its members. Petitioner's members compete for business, are subject to the same union work rules regarding the number of workers required in a gang, and pay the same wages. The only factor that might vary is the time required to complete a job; however, petitioner has failed to introduce any evidence that a work gang works faster for one employer than another. Consequently, each member should know or be able to calculate how many labor hours are required for a job based on its own experience. There is simply no evidence in the record to substantiate petitioner's claim for a need of confidentiality of the payroll information in question. Furthermore, there is no evidence in the record proving that it would be harder to obtain the information from petitioner than an outside business enterprise. After all, petitioner already transmits the payroll information to the Service Bureau Corp., which itself is a commercial enterprise. Finally, even assuming that disclosure of the payroll information could create a competitive advantage for one member, secrecy benefits individual members, not the industry as a whole. Even if one of petitioner's members lost a contract because of the disclosure of the payroll information in question, the work still would be done by another one of petitioner's members. The identity of an individual contractor would make no difference to the industry as a whole, only to the two members directly involved.

With respect to petitioner's fourth contention that the only activities that could be performed by a commercial organization are being performed by the Service Bureau Corp., we simply do not find this argument convincing. We see no reason why some or all of the activities performed by petitioner could not be performed by either the Service Bureau Corp. or one of its competitors, such as a bank and/or accounting firm. A commercial business could report the payroll information to

the Service Bureau Corp., receive it back, collect the money from petitioner's members pursuant to the information received, and pay the benefits to the union employees. By performing these functions, petitioner is competing with nonexempt organizations.

Finally, with respect to petitioner's fifth contention that its administrative functions are not performed in a manner that has the characteristics of a trade or business under section 162, petitioner relies primarily on the fact that the vacation pay and guaranteed annual income assessments are raised solely from its members and that it has never advertised the availability of its services to nonmembers. In advancing these arguments, petitioner ignores the definition of the term "trade or business" under section 513(c), which states that a trade or business includes "any activity which is carried on for the production of income from the sale of goods or the performance of services." Petitioner clearly sells a service for which it receives a substantial sum of money. In fact, a large portion of its receipts, over which it has discretionary control, are received by reason of its performing the challenged services. In a recent case, we held that, where a corporate taxpayer is involved, "the determinative factor in resolving the trade or business issue is whether the activity was engaged in with the intent to earn a profit." *Professional Insurance Agents v. Commissioner*, 78 T.C. 246, 262 (1982), on appeal (6th Cir., Aug. 13, 1982). We think that requirement is clearly satisfied in the present case. The service performed was of plainly commercial nature. Petitioner receives membership dues of less than $20,000 per year, which constitutes only a small fraction of its gross revenues. Petitioner contends that substantially in excess of 50 percent of its gross revenues are derived from vacation pay and guaranteed annual income assessments and that without these fees, petitioner's members' dues would have to be raised substantially. There is thus an obvious profit motivation with respect to the activities in question. Accordingly, we hold that such activities constituted a trade or business activity for purposes of section 513(c).

B. *Regularly carried on.*

The second requirement that must be met in order to impose the tax on UBTI is that the trade or business be "regularly

carried on." Petitioner has advanced no argument in this case that its activities with respect to the vacation pay and guaranteed annual income accounts were not regularly carried on nor would we look with favor upon such argument in light of the ongoing and continuous nature of its activities. Accordingly, we hold that petitioner's trade or business was regularly carried on within the meaning of sections 1.513–1(a) and 1.513–1(c), Income Tax Regs.

## C. *Not substantially related.*

The third and final requirement that must be met in order to impose the UBTI tax is that the conduct of the trade or business must not be substantially related to the organization's performance of its exempt function. This requirement necessitates an examination of the relationship between the business activities that create the income in question and the accomplishment of the organization's exempt purposes. Sec. 1.513–1(d)(1), Income Tax Regs. Section 1.513–1(d)(2), Income Tax Regs., provides the following explanation of the meaning of "substantially related":

(2) *Type of relationship required.* Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially" related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes. Where the production or distribution of the goods or the performance of the services does not contribute importantly to the accomplishment of the exempt purposes of an organization, the income from the sale of the goods or the performance of the services does not derive from the conduct of related trade or business. Whether activities productive of gross income contribute importantly to the accomplishment of any purpose for which an organization is granted exemption depends in each case upon the facts and circumstances involved.

Thus, in order for petitioner to avoid the tax on UBTI, it must prove that its activities with respect to the vacation pay and guaranteed annual income accounts contribute directly and

importantly to the accomplishment of one or more of its exempt functions. In this regard, section 513(a) specifically states that the mere satisfaction of an exempt organization's need for operational funds is insufficient to establish the type of relationship necessary to avoid the tax.

According to section 1.501(c)(6)–1, Income Tax Regs., an exempt business league is "an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit." To this end, petitioner's bylaws, to quote again, state that its general purpose is:

to promote the interests of the Port of Baltimore and vicinity, to further the common interests of those business establishments which are directly engaged in or render services to the maritime trade in the Port of Baltimore, to render assistance to the membership in the solution of their maritime problems, to maintain harmony between management and labor, to foster just and equitable principles and practices among those engaged in the maritime trade, to cooperate with public officers, other organizations and associations who, through the exercise of their authority or the conduct of their activities, govern, regulate or promote any of the affairs of the Port for the betterment, expansion, development and prosperity of the Port.

Petitioner's activities as a contract negotiator and arbitrator admittedly contributed to these exempt purposes since they benefit the industry as a whole rather than any individual member. Petitioner is not paid for these services directly but does receive dues of an equal amount from each member.

However, petitioner's activities as a contract negotiator and arbitrator are accomplished separately from, and are unrelated to, petitioner's administrative activities of keeping track of each employee's hours and the collecting and disbursing of funds for the vacation pay and guaranteed annual income accounts. In return for these services, petitioner charges each member a fee based on the size of each member's hourly payroll. Petitioner does pay out a large portion of the fee it collects from the members to the Service Bureau Corp. in exchange for its computer processing of the information kept by petitioner. However, since the amounts paid out to the Service Bureau Corp. constitute only approximately half of the fees charged, petitioner still realizes a substantial profit from

the fees it receives from its members. It is this activity alone that respondent contends fails the test set forth under the regulations and is not part of petitioner's exempt function. We agree with respondent.

Petitioner's administrative activities with respect to the vacation pay and guaranteed annual income accounts benefit each member of petitioner individually rather than the industry as a whole. Each of petitioner's members is bound by the terms of the collective bargaining agreement negotiated by petitioner for its members. Under such agreement, each member is individually liable to contribute a certain amount of money per man-hour to the vacation pay and guaranteed annual income accounts. It is thus to each member's benefit to find an economical way to fulfill its individual responsibilities set forth under the collective bargaining agreement.

In the instant case, petitioner performs a function that allows its members to share collectively the costs of their individual liabilities under the collective bargaining agreement. Were it not for petitioner performing these administrative activities, it would be incumbent on petitioner's members to procure a profit-making business enterprise to fulfill the ministerial role performed by petitioner. In exchange for its services, petitioner charges each member a different fee, based on the extent its services benefit each particular member. Petitioner's members thus receive a proportional benefit from their cost-sharing arrangement with petitioner based on the amount that each member utilizes petitioner's services. In *Evanston-North Shore Board of Realtors v. United States*, 162 Ct. Cl. 682, 320 F.2d 375, 378-379 (1963), cert. denied 376 U.S. 931 (1964), the court emphasized just such proportional benefit as the most important factor demonstrating that a multiple listing system operated by member realtors was not exempt under section 501(c)(6). Similarly, in *Contracting Plumbers Cooperative Restorration Corp. v. United States*, 488 F.2d 684, 688 (2d Cir. 1973), cert. denied 419 U.S. 827 (1974), the court held that, where individual benefits are precisely proportional to a member's financial involvement in an organization, such organization is not exempt under section 501(c)(6) since the fundamentally nonexempt purpose of providing a necessary service at a reduced cost becomes too clear to be ignored. We

find the presence of such proportional benefits to be the determinative factor in this case.[4]

In conclusion, we find that the administrative services performed by petitioner clearly benefited its members individually. Additionally, the profits received from its carrying on of these activities generate funds to finance its other exempt functions. However, these benefits are not enough to establish the requisite causal relationship between the activities in question and its exempt purposes. Accordingly, we hold that the income from petitioner's administrative activities with respect to the vacation pay and guaranteed annual income accounts was derived from a regularly carried on trade or business bearing no substantial relationship to petitioner's exempt function and is thus subject to the tax imposed by section 511(a).

*Decision will be entered for the respondent.*

---

[4]In reaching this decision, we find our recent decision in *Kentucky Municipal League v. Commissioner*, 81 T.C. 156 (1983), distinguishable. The petitioner in that case, the Kentucky Municipal League, was a nonprofit organization exempt from tax under sec. 501(c)(4). The league was organized, owned, and operated by the cities of Kentucky to promote practical, effective, and economical government. Since 1954, the league assisted 70 of its members in the collection of unpaid license taxes in exchange for 50 percent of the amounts collected. The league did not collect the unpaid taxes itself relying instead on the assistance of a nonexempt organization which retained 37.5 percent of the taxes collected in exchange for its services. On its return for the tax year in question, the league reported gross receipts of $121,998, including its share of the unpaid taxes. Of this amount, 42 percent was composed of dues from members and only 24 percent was derived from the collection of unpaid taxes. The Commissioner determined that the league's share of unpaid taxes constituted unrelated business taxable income; however, we disagreed, finding that the league's collection activity was substantially related to the performance of its exempt function.

We find our holding in *Kentucky Municipal League* distinguishable from our decision in the present case on three grounds. First, the receipts from petitioner's administrative activities with respect to the vacation pay and guaranteed annual income accounts represent a substantially larger percentage of its gross receipts than those from the collection of unpaid taxes did in *Kentucky Municipal League*. Second, in *Kentucky Municipal League*, the petitioner therein was performing a service which was not available from a commercial enterprise. Third and more importantly, each of the Kentucky Municipal League's members was itself a tax-exempt entity. Thus, it made no difference in that case that the activity in question clearly benefited some of the League's members individually rather than the group as a whole.